# Richmond.

INTERSTATE COAL AND IRON COMPANY *v.* CLINTWOOD COAL
AND TIMBER COMPANY AND OTHERS.

November 23, 1905.

June 28, 1906.

1. EVIDENCE—*Admissions of Vendor After Parting With Title.*—No admission of a vendor of land, after he has parted with his title, though he be at the time occupying the land as tenant of his vendee, can be admitted to prejudice the title of such vendee.

2. EVIDENCE—*Admissibility—Opinions—Hearsay.*—On the trial of an action of ejectment, the opinion of a lawyer, who procured for his client a release deed from a third person of the property in controversy, as to the necessity for obtaining the signature to said release deed of one under whom the defendant claims, is irrelevant to the issue joined and should not be received.

3. LAND—*Severance of Title to Minerals—Relation of Owners—Presumption as to Ownership of Underlying Minerals—Burden of Proof.*—The ownership of the surface of land and of the underlying minerals may be severed, and when severed the owners of the different subjects are neither joint tenants nor tenants in common. They are not owners of undivided interests in the same subject, but of distinct subjects of entirely different natures. The title to the freehold of the one subject cannot be acquired by the adverse possession of the other. The presumption, however, is that the owner of the surface owns all beneath it, and the burden is on the person claiming that there has been a severance of title and interest to prove it, either by deed of record, or by the proof of such facts and circumstances, brought home to the party sought to be charged, as will affect his conscience with notice of adverse rights, or will serve to put him on inquiry which would lead to such knowledge.

4. Evidence—*Admissibility—Severance of Title to Land and Underlying Minerals—Case at Bar.*—A father conveyed a tract of land to his son, and it was subsequently sold for the son's debts, and purchased by a third person. The object of the present action was to recover the underlying coal from the purchaser. In order to affect the purchaser with notice of the severance of title to the underlying coal from the surface the plaintiff offered in evidence a written compromise, made by the father while he was the owner of the land, with parties under whom the plaintiff claims, whereby the coal was released to them; and an agreement, made by the son while owner, reciting the compromise and employing a third person to have it set aside, and a power of attorney to the same person, authorizing him to settle all business relating to the land at the time of the compromise. If there ever was a severance of the ownership of the coal from the ownership of the surface it was by virtue of the compromise, which was never carried out, and to which the son was not a party, and which does not appear in his chain of title. It was never recorded, and it is not shown by the evidence that he had any other knowledge of it than such as was derived from his presence at a numerously attended meeting called to inaugurate a movement to set it aside, where the subject was discussed; but there was no proof that he took part in the discussion, or was informed with reference to it. In the view of this court he was not a party to the agreement reciting the compromise, and the power of attorney, which he signed with his cross-mark and acknowledged before an officer, was insufficient to bring home to him knowledge or notice of the contents of the compromise. Therefore the exclusion of all three of these papers (the compromise, the agreement, and the power of attorney) was correct.

5. Verdict—*Erroneous Instructions—Harmless Error—Case at Bar.*— The verdict of a jury will not be set aside because of erroneous instruction, where the court is satisfied that no other verdict could have been properly found by the jury. In the case at bar the defendant having acquired title by adverse possession for the requisite time immediately preceding this action, it is immaterial if error was committed in instructions relating to adverse possession by the defendant at a prior time.

*On Rehearing.*

6. Evidence—*Excluding Principal Document—Subordinate Papers.*— The compromise referred to in paragraph 4 above and the record

of the suit to annul it having been properly excluded from the evidence in this cause, the agreement and power of attorney referred to in that paragraph offered for the purpose of showing knowledge of the compromise were immaterial and inadmissible in evidence.

7. Evidence—*General Objection—Effect of Exclusion.*—Where the objection to the introduction of documents in evidence is general, the ruling of the trial court in excluding them will not be reversed, if for any reason they were inadmissible.

8. Appeal and Error—*Errors Submitted—Moot Questions.*—The functions of this court are exhausted when it has ruled on the specific assignments of error submitted. It cannot, and will not, give mere advisory opinions for the purpose of influencing future litigation.

Error to a judgment of the Circuit Court of Dickenson county, in an action of ejectment. Judgment for defendants. Plaintiff assigns error.

*Affirmed.*

After all the evidence was in, the court, on the motion of the plaintiff and of the defendants, respectively, gave the following instructions:

PLAINTIFF'S INSTRUCTIONS.

"(1) The court instructs the jury that all written instruments should be construed according to their true intent and meaning, and further tells the jury that it is the province of the court to determine the true intent and meaning of all written instruments introduced in evidence. And the court further tells the jury that, taking into consideration the fact that the north line of patent No. 20, of 5,000 acres, introduced by plaintiff, calls for running with a line of patent No. 21, of 5,000 acres; that the first corner called for in said patent No. 20 is a white oak, walnut and ash, called for as the southeast corner of patent No. 21, of 5,000 acres, and that the fourth

corner called for in said patent No. 21 is likewise a white oak, walnut and ash; that the second corner called for in said patent No. 20 is two poplars, and that the third corner called for in said patent No. 21 is likewise two poplars; that the first line of patent No. 9, of 10,000 acres, calls for running N. 23 W. with lines of patent Nos. 20 and 21, of 5,000 acres; that the first line of said patents No. 21 calls for running S. 67 W. with patent No. 8, of 4,000 acres, and that the second line of patent No. 15, of 5,000 acres, calls for running N. 23° W. with line of Nos. 20 and 21, of 5,000 acres; the court is of opinion that said patent No. 21, of 5,000 acres, is a parallelogram, lying immediately northward of patent No. 20, of 5,000 adjoining the said last named patent of the same length and width as said last named patent; that the beginning corner of said patent No. 21 is at the southeast corner of patent No. 8, of 4,000 acres, instead of the southwest corner; that the second line in said patent No. 21 should be run S. 23° E. instead of S. 23° W.; that the third line of said patent should be run N. 67° E. instead of N. 7° E. and that the fourth corner of said patent No. 21 is the same as the beginning of corner of said patent No. 20, of 5,000 acres; that in determining the location on the ground of said patent No. 21, the jury will act in accordance with this instruction.

"(2) The court further instructs the jury that it appears from the various patents introduced by the plaintiff lying to the west of the line running N. 23° W. from Dump's creek call for or are called for by patents which extend to and call for Guest's river on the west, and that the law will extend the said patent bordering on the said line running N. 23° W. from Dump's creek until they meet the said patents which border on Guest's river, and that there is no vacant land between said patents; that is, there is no land between said lines running N. 23° W. and Guest's river, which is not *cover* by some of said

patents; and if they believe, from the evidence, that the northeast corner of patent No. 1, of 1,500 acres, is properly located on Dump's creek, as shown by the map of Surveyor Keel, and that the land in controversy is properly located, as shown on said map, they will find the said land in controversy is covered by some of the Richard Smith patents, introduced by the plaintiff; and if this be the case, then the patent to James Swan, introduced by the defendant, is void.

"(3) The court instructs the jury that if patents No. 21, of 5,000 acres, or No. 9 or 10, of 10,000 acres, or any of them introduced by the plaintiff, cover the land in controversy, and if it is also covered by the deed from Burns, com., to James Campbell, then the plaintiff has the legal title to the coal and other minerals in, on and under said land, and the jury should so find unless they believe from the evidence either that Richard Smith conveyed said land to John Warder, in 1806, or that the defendants, the Clintwood Coal and Timber Company, and those under whom it claims, have acquired title to said coal and minerals by adverse possession.

"(4) The jury are further instructed that whereas, in the deed from Richard Smith to Warders, he expressly excepted 50,000 acres, or thereabout, lying at or near the junction of Guest's and Clinch river, and binding on both of said rivers, which he had theretofore sold to the Frenchman, De Teubeuf, and afterwards the heirs of Richard Smith, through Burns, com., conveyed the tract of land to James Campbell, who claimed under said Frenchman, describing the said land as containing 55,000 acres, more or less, and as lying on Guest's and Clinch rivers, they are entitled, if they believe, from the evidence, that said land so conveyed to James Campbell lies within the outside boundary of the land conveyed by said Smith to the Warders and also lies at or near the junction of the Guest's and

Clinch rivers, and binds on both of said rivers, without more or other evidence to conclude that the said land so conveyed by the said Burns, commissioner, to the said Campbell, is the same land which was excepted in the said deed from Richard Smith to the Warders.

"(12) The court further instructs the jury that the deed read in evidence by the defendants from Richard Smith to John Warder and others is no evidence of an outstanding title to the land in controversy unless they believe, from the evidence, that the outside boundary of said deed covers the land in question nor unless they further believe, from the evidence, that the reservation in said deed in favor of the Frenchman, De Teubeuf, does not cover the land in controversy."

"Thereupon, on motion of the defendants, the court gave to the jury the following instructions:

## DEFENDANT'S INSTRUCTIONS.

"(1) The court instructs the jury that if they believe from the evidence, that in June, 1861, Jacob Chaney entered into possession of the land in controversy under color of title describing the whole thereof, and that in 1864 he, the said Chaney, sold said land to William Sutherland, by a writing describing the same, and that William Sutherland, then or shortly afterwards gave the said land to his two sons, Jasper Sutherland and E. T. Sutherland, and that Jasper Sutherland went on said land T. Sutherland, and that Jasper Sutherland went on said land, cleared, cultivated and improved the same and held possession thereof openly, notoriously and continuously for ten years after January 1, 1869, then good title to said land in controversy, and each and every part and parcel thereof, was thereby vested

in him, the said William Sutherland, which could not be divested except by deed and that after said ten years had elapsed neither said William Sutherland, Jasper Sutherland or E. T. Sutherland could, by any act short of a conveyance, divest themselves of the legal title so said land, or any part thereof; and if the jury so believes they shall find for the defendants.

"(3) The court instructs the jury that even that should they believe that E. T. Sutherland did not claim one-half of the coal in controversy between the year 1883, and the date of the sale of his interest to his brother, Jasper, that fact shall be treated by the jury as wholly immaterial in this case.

"(4) The court further instructs the jury that if they believe, from the evidence in this case, that the land in controversy is included in the deed from Jacob Blair to Jacob Chaney, of 1861, offered in evidence and that the said Chaney afterwards sold the said land by a written contract to William Sutherland in 1864, and that said William Sutherland gave the said land to Jasper Sutherland and Elijah Sutherland and that the said Jasper Sutherland took the actual possession of said land, pursuant to said gift, and remained in the actual continuous and exclusive possession thereof, claiming the same as his own for the period of ten years from the first day of January, 1869, then the jury should find for the defendants.

"(5) The court further instructs the jury that if they believe, from the evidence in this case, that William Sutherland conveyed the land in question to Jasper Sutherland in the year 1887 or 1888, then the deed from the said William Sutherland to the Virginia Carolina Steel and Iron Company in the year of 1894 passed no title to the said Virginia, Tennessee and Carolina Steel and Iron Company.

"(6) The court instructs the jury that the plaintiff must show a legal title in itself and a present right of possession at

the time of the commencement of this action before the defendants are called upon to show anything, and the party in possession is presumed to be the owner until the contrary is proved.

"(7) The court further instructs the jury that if they believe, from the evidence in this case, that Jasper Sutherland was at any time living upon, occupying and in actual possession of the land in question, then such possession during its continuance was notice to all persons whomsoever of whatever claim said Jasper Sutherland had to said land in question.

"(8) The court instructs the jury that adverse possession is the actual occupied possession under color and claim of title, and it is wholly immaterial whether this claim of title be under a good or a bad, a legal or an equitable, title.

"(9) The court instructs the jury that if they believe the defendants have had adverse possession of the land in dispute for the period of ten years prior to this suit, that this gives the defendants the right to recover even against the strongest proof of a title which, independent of such adversary possession, would be a better title, and the jury should find for the defendants.

"(10) The court instructs the jury that if they believe, from the evidence in this case, that Jasper Sutherland, William B. Sutherland and the Clintwood Coal and Timber Company have been in adverse possession of the land described in the plaintiff's declaration under color of title since the deed, or either of the deeds from William Sutherland to Jasper Sutherland, made in the year 1887 or 1888, respectively, continuously for ten years or more prior to the bringing of this suit, that they should find for the defendants.

"(11) The court instructs the jury that if they believe, from the evidence in this case, that Jacob Blair conveyed the land in

controversy to Jacob Chaney by the deed of 1861, offered in evidence, and that the said Jacob Chaney sold said land by a written contract in 1864 to the said William Sutherland, and that the said William Sutherland gave the said land to Jasper Sutherland and Elijah Sutherland, and that Jasper Sutherland, pursuant to said gift, took the actual possession of said land, claiming an undivided one-half interest therein as his own, then, in that event, his possession was the possession of the said William Sutherland, and that if the said Jasper Sutherland so remained in the actual, continuous, exclusive, adverse and notorious possession of the said land, claiming the said undivided one-half interest therein as his own for the period of ten years from the first day of January, 1869, and that the said William Sutherland conveyed the whole of the said tract of land to the said Jasper Sutherland in 1887, then the jury should find for the defendant."

The following instructions were offered by the plaintiff, but were refused, and thereupon the plaintiff excepted:

"(1) The jury are further instructed that in order for one to acquire title to land by possession he must prove that he, or those under whom he claims, have had the continuous, open, notorious and adverse possession thereof for a period of ten years before the commencement of the suit in which such title is brought into question, and must further show that during the whole of such period the party in possession was claiming the said land as his own, or, if he be a lessee, then as the land of the lessor, and the jury are, therefore, instructed that if they believe, from the evidence, that between 1887, when Jasper Sutherland obtained a deed for the land in question from his father, and in 1894, when the same was sold and pur-

chased by William Sutherland, he, the said Jasper Sutherland, did not claim the coal and other minerals in, on and under said land, then they cannot find that the defendants have acquired title thereto by possession.

"(2) The jury are further instructed that it does not appear from the evidence that Jasper Sutherland had any color of title for the land in question, until the —— day of January, 1887, and, therefore, the defendants cannot rely upon adverse possession until on and after the —— day of January, 1887.

"(3) The jury are further instructed that if they believe, from the evidence, that William Sutherland, in the year 1883, signed what is known in this record as the Imboden compromise, and that Jasper Sutherland knew of said compromise before he obtained his deed from his father, in 1887, and that, in 1888, the said William Sutherland and others brought a suit in equity against Jack and C. D. Carter and others to set aside the compromise, and that William B. Sutherland knew of said compromise and of said suit before he purchased the land, or before he fully paid therefor and obtained his deed therefor in 1901, and that the Clintowod Coal and Timber Company, through their agent, George W. Sutherland, knew, before it purchased the said land, that the plaintiff was claiming title to the coal and other minerals thereon, then they are instructed that the possession of the surface of said land, from 1893 on, was not adverse to the plaintiff and those under whom it claims, insofar as the coal and other minerals are concerned, and that the defendants cannot rely upon adverse possession to defeat the plaintiff's claim to said coal and other minerals.

"(4) The jury are further instructed that even though they may believe that William Sutherland gave an undivided one-half interest in the land to his son, Jasper Sutherland, before 1883, yet if they believe that he did not give the remaining

one-half interest therein to his son, Elijah Sutherland, until after 1883, and that in 1883 said William Sutherland entered into said Imboden compromise, then the possession of Jasper Sutherland and those claiming under him of the said land from 1883 on, was not adverse to the plaintiff, and those under whom it claims, as to an undivided one-half interest in the coal and other minerals in, on and under said land, and the defendants could not defeat the claim of the plaintiff to such undivided one-half interest in the coal and other minerals on the land by reason of adverse possession.

"(5) The jury are further instructed that even though they may believe that William Sutherland gave the land in controversy to his son, Jasper Sutherland, before the year 1883, and that William Sutherland therefore had no right to enter into said Imboden compromise, but that he, nevertheless, did enter into the same, and that the said William Sutherland, together with others afterwards, in 1888, instituted a suit in equity to set the said compromise aside, and that Jasper Sutherland, prior to bringing of said suit, entered in an agreement with one F. A. Stratton and agreed to convey to him one-half of the coal on the land in controversy, provided he would employ counsel and have said suit brought, and succeeded in getting the said compromise set aside, and that the said suit was brought pursuant to the agreement, and that afterwards, to-wit, in 1894, the said William Sutherland agreed that the said suit should be dismissed, and that he would make a deed to the Virginia, Tennessee and Carolina Steel and Iron Company, pursuant to said compromise, and that the said suit was dismissed accordingly, and that William Sutherland did make the said deed, and that William B. Sutherland had notice of said compromise agreement and of the said suit before he purchased said land, or before he fully paid and obtained a deed therefor, and that the

Clintwood Coal and Timber Company, before it purchased the said land, had notice of the plaintiffs' claims thereto, then they are estopped from denying that the said William Sutherland had authority to enter into the said compromise, and further estopped from controverting the title of the said William Sutherland to the coal and minerals in, on and under said land, and from disputing the plaintiffs' claim thereto, and the jury will find for the plaintiff as to the said coal and minerals.

"(6) The court further instructs the jury that when it appears that the plaintiff and defendant, in an ejectment suit, trace title back to and claim under the same person, the defendant cannot deny the title of such person under whom both he and the plaintiff claim, and in such case it is necessary for the plaintiff to prove that such person, under whom both he and the defendant claim, really had title to the land in controversy, and if, therefore, they believe, from the evidence, that William Sutherland did not dispose of an undivided one-half interest in the land in controversy until after the date of what is known in this record as the "Imboden compromise,' and that he, the said William Sutherland, had the right to sign said compromise at least to an undivided one-half interest in said land, and that he did sign the same, and that Elijah Sutherland recognized the right of said William Sutherland to sign the said compromise, and that the said William Sutherland thereafter gave the said undivided one-half interest in said land to said Elijah Sutherland; that the said Elijah Sutherland thereafter sold his interest in the said land to his brother, Jasper Sutherland, and that the said Jasper Sutherland, before he purchased from the said Elijah Sutherland, had notice of the said compromise; that William B. Sutherland likewise had notice of the said compromise before he purchased the said land at the judicial sale in 1894, or before he fully paid therefor and obtained

deed therefor, and that the Clintwood Coal and Timber Company, before it purchased the said land, had notice of the plaintiffs' claim thereto, and that the said William Sutherland, in the year 1894, executed to the Virginia, Tennessee and Carolina Steel and Iron Company a deed conveying to it the coal and other minerals in, on and under said land, and that the title of the said Virginia, Tennessee and Carolina Steel and Iron Company to said coal and other minerals passed by diverse *mesne* conveyances to the plaintiff before the commencement of this suit, then the defendants are estopped from denying that the said William Sutherland had the right to make said compromise as to an undivided one-half interest in said coal and minerals, and the possession of defendants from 1883 on was not adverse to the plaintiff as to the said one-half undivided interest in the said coal and other minerals.

"(7) The jury are further instructed that if they believe, from the evidence, that the plaintiff and those under whom it claims, in good faith, believed that William Sutherland had the right to enter into what is known as the Imboden compromise, and that after the date of said compromise they relied thereon, and that Jasper Sutherland knew that they were relying thereon, then it was the duty of the said Jasper Sutherland, if he was claiming the coal and other minerals on said land, to make this fact known to the plaintiff, or those under whom it claimed, and unless and until he did so make known his claim his possession of the surface of the said land was not adverse to the plaintiff and those under whom it claimed.

"If the jury believe, from the evidence, that William Sutherland gave the land in controversy to Jasper Sutherland in 1864, but made him no writing therefor, then the possession of said Jasper Sutherland was confined to his actual inclosures on

said land, if he had any up to January ——, 1887, the date on which he obtained a deed from his father for said land."

*Bullett & Kelly, J. C. Smith, W. A. Ayers* and *J. Norment Powell,* for the plaintiff in error.

*Ayers & Fulton, O. M. Vicars, A. A. Skeen, S. H. Sutherland* and *R. E. Chase,* for the defendants in errror.

KEITH, P., delivered the opinion of the court.

This is an action of ejectment, brought by plaintiff in error, to recover a certain tract of land lying in Dickenson county, and the real subject of controversy is the coal underlying the surface rather than the surface itself; the claim upon the part of plaintiff in error being that the coal and the surface are held by distinct titles, and that while defendants in error may be the owners of the surface, they wrongfully claim the minerals beneath it.

Upon the trial there was a verdict and judgment for the defendants, and a writ of error was allowed to the Interstate Coal and Iron Company, which brings the case before us for review.

We shall assume in this opinion, without further investigation, that plaintiff in error made out a complete paper title to the premises in question.

The case of defendants in error rests upon their claim of adversary possession, and upon that defense the facts are as follows: Jacob Chaney conveyed this land to William Sutherland in 1864, by deed, which has been lost or destroyed. William Sutherland put his son, Jasper, into immediate possession, and Jasper has since then continuously lived upon the land. No deed or other writing, however, was ever given by William

Sutherland to Jasper until the year 1887. It appears that William Sutherland intended this tract of land for his two sons, Jasper and Edward T. Sutherland. There is uncertainty in the proof as to whether Jasper Sutherland occupied the land from 1864 until 1887 as a donee of William Sutherland, or as his tenant. E. T. Sutherland sold whatever interest he had in the land to his brother, Jasper, but he made no deed, the title being still in their father; and on January 15, 1887, William Sutherland conveyed the land to Jasper. In February, 1888, he and his wife executed another deed to Jasper for the same land, in order to correct certain errors in the former deed, and to make the description thereof more specific. Jasper became involved in debt, and in a suit, brought by his creditors, in the Circuit Court of Dickenson county, his interest was sold and purchased by his brother, William B. Sutherland. This sale was made on the 13th of July, 1894, was duly reported to the court, and by it confirmed on the 11th day of February, 1895, but a deed conveying the legal title appears not to have been executed until the 27th day of June, 1901. The evidence is clear and conclusive that from January, 1887, until the institution of this suit, on the 13th day of October, 1902, a period of more than fifteen years, Jasper Sutherland and his vendee had been in the open, notorious, exclusive and hostile possession of the land in dispute.

During the progress of the trial the plaintiff in error offered to introduce the record of a suit instituted by Joseph Kelly and others against the heirs of Dale Carter and Mary Campbell. This suit was brought by a number of plaintiffs, citizens of Dickenson county, who had squatted on portions of what is known as the "French lands," for the purpose of setting aside the Imboden compromise, which was an agreement dated February 19, 1883, between F. M. Imboden, as agent for Dale

Carter's heirs, and Mary Campbell, Joseph Kelly, William Sutherland and a number of others, by which Kelly and others agreed to release the coal and other minerals on the lands then claimed by them, respectively, in consideration that the Carter heirs and Mary Campbell would release the surface and timber to them. This compromise agreement was never carried into execution, and, in 1888, the plaintiffs, Joseph Kelly, William Sutherland, and all of the parties who had signed the compromise, save one or two, brought this suit for the purpose of having it vacated and annulled. The devisees of Mary Campbell answered in the case, and numerous depositions were taken. The suit pended for a number of years and was transferred from court to court until it finally reached the Circuit Court of Washington county, where it was dismissed, the order of dismissal being as follows: "On motion of complainants, by counsel, Bullitt & McDowell and D. F. Bailey, and by agreement of defendants, by their counsel, it is ordered that this cause be dismissed at the defendant's cost, and the cause is retired from the docket." It appears that this dismissal was in pursuance of a voluntary settlement made by the plaintiffs with the Virginia, Tennessee and Carolina Steel and Iron Company, which had theretofore purchased the interest of the Campbells in the land in controversy.

In connection with this suit, the object of the offer of which was to bring the Imboden compromise into this record, an agreement, dated October 7, 1887, between F. A. Stratton and practically all of the parties who signed the Imboden compromise, and also a power of attorney, dated the same day, from the same parties, or the greater part of them, were also offered in evidence. But the court refused to permit the record and papers to be read in evidence to the jury, and in this we think there was no error.

Jasper Sutherland was not a party to the Imboden compromise, nor was he a party to the suit to have that compromise set aside. He is named as a party to the agreement between Elihu Long and others, on the one part, and F. A. Stratton, on the other part, the object of which was to employ Stratton to have the Imboden compromise set aside, and that paper sets out the Imboden compromise quite fully and may fairly be said to have brought home substantial knowledge of its contents to all who were parties to it. But though Jasper Sutherland's name appears as one of the signers with his cross-mark affixed, he does not appear from the certificate of the commissioner in chancery as one of those who acknowledged its execution before him. There is no evidence that Jasper Sutherland can read; there is the presumption from the fact that he signed his name with a cross-mark that he cannot read; and there is no evidence in the record which proves or tends to prove any knowledge on his part of the contents of the paper known as the Imboden compromise. His name appears also in the power of attorney from Sympson Dyer and others, the object of which was to create F. A. Stratton an attorney "to settle up in full all business for us as it relates to the land now owned or occupied by us at the time of the compromise made and entered into by and between F. M. Imboden, as agent for Dale Carter's heirs," etc. This paper is also signed by Jasper Sutherland with his cross-mark, and his name appears as one of those who acknowledged it before D. B. R. Sutherland, a commissioner in chancery. But we do not think that this is sufficient to charge him with knowledge of the terms of that compromise, and, therefore, that all of these papers were properly excluded.

There was an effort to prove that Jasper Sutherland never laid claim to the coal subsequent to the Imboden compromise; but all that could be extracted from any of the witnesses was that

the question was never raised, and that they never heard any-
thing said upon the subject; while Jasper Sutherland in his
deposition (and he is a disinterested witness) states positively
that he asserted entire ownership over all of the land, including
the coal.  There was an effort to prove by a witness that Jasper
Sutherland had admitted to him that the Interstate Coal and
Iron Company owned the coal on the land in controversy; but it
appears that at the time of the alleged admission Jasper Suther-
land had been deprived by the proceedings in the chancery suit
brought by his creditors of all interest in the premises, so that
no admission of his prejudicial to the interests of his vendee
could properly be admitted.  He was at the time of the alleged
admission occupying the land as a tenant of his brother and
vendee, William B. Sutherland, and no admission of his in
derogation of his title could be binding upon his vendee.

It seems that William Sutherland and others executed a re-
lease deed of this property to the Virginia, Tennessee and Caro-
lina Steel and Iron Company, in 1894, and that Jasper and
William B. Sutherland refused to sign this deed, and the witness
by whom their refusal was proved was asked if Judge Richmond,
the attorney engaged in the endeavor to perfect the title of this
land in the Virginia, Tennessee and Carolina Steel and Iron
Company, considered it necessary for Jasper and William B.
Sutherland to sign this deed of release.  The court excluded this
evidence, and in this ruling we are of opinion that there was no
error.  We cannot see upon what principle the opinion of Judge
Richmond could be regarded as a fact to be considered by the
jury in the trial of the issue before them.

It is true that the ownership of coal or other underlying
mineral may be separated from the surface by a deed of record,
and that thereafter there will be two estates in the same land
(*Va. Coal and Iron Co.* v. *Kelly,* 93 Va. 352), and where such

separation has taken place the owner of the surface of the land and the owner of the minerals under it are neither joint tenants nor tenants in common. "They are not the owners of undivided interests in the same subject, but are the owners of distinct subjects of entirely different natures. The title to the freehold of the one, either in the surface or the minerals, cannot be acquired by adverse possession of the other, and the purchase of the outstanding title by the one does not enure to the benefit of the other." But the presumption, we think, is that the owner of the surface owns all beneath and above the surface, and the burden is upon him who is interested to prove that there has been a severance of the interest and title, either by a deed of record, or by proof of such facts and circumstances brought home to the party sought to be charged as will affect his conscience with notice of adverse rights, or will serve to put him upon inquiry which would lead to such knowledge.

In this case the severance of the ownership of the coal from the ownership of the surface was brought about, if at all, by the Imboden compromise. That agreement was never executed; Jasper Sutherland was not a party to it; it does not appear in his line of title; it was never recorded; and it is not shown by the evidence that he had any other knowledge of it than such as was derived from his presence at a numerously attended meeting called to inaugurate a movement to set aside that compromise, where the subject seems to have been discussed, but without any proof that he took part in the discussion, or was informed with reference to it. He is not a party to the first agreement with Stratton, in which the terms of the Imboden compromise are set out, and the power of attorney, which he signed with his cross-mark and acknowledged before a commissioner in chancery, is insufficient to bring home to him knowledge or notice of the contents of that compromise. We are of opinion, there-

fore, that upon all of these subjects the ruling of the Circuit Court was without error.

The court gave to the jury, at the instance of the defendants, certains instructions, which were objected to by plaintiff in error, and among them were the following:

"The court instructs the jury that if they believe, from the evidence, that in June, 1861, Jacob Chaney entered into possession of the land in controversy under color of title describing the whole thereof, and that in 1864 he, the said Chaney, sold said land to William Sutherland, by a writing describing the same, and that William Sutherland, then or shortly afterwards, gave the said land to his two sons, Jasper Sutherland and E. T. Sutherland, and that Jasper Sutherland went on said land, cleared, cultivated and improved the same and held possession thereof openly, notoriously and continuously for ten years after January 1, 1869, then good title to said land in controversy, and each and every part and parcel thereof, was thereby vested in him, the said William Sutherland, which could not be divested except by deed, and that after said ten years had elapsed neither said William Sutherland, Jasper Sutherland, or E. T. Sutherland, could, by any act short of a conveyance, divest themselves of the legal title to said land or any part thereof, and if the jury so believes they shall find for the defendants.

"The court further instructs the jury that if they believe, from the evidence in this case, and the land in controversy is included in the deed from Jacob Blair to Jacob Chaney of 1861 offered in evidence, and that the said Chaney afterwards sold the said land by a written contract to William Sutherland in 1864, and that said William Sutherland gave the said land to Jasper Sutherland and Elijah Sutherland, and that the said Jasper Sutherland took the actual possession of said land, pursuant to said gift, and remained in the actual, continuous and

exclusive possession thereof, claiming the same as his own, for the period of ten years from the first day of January, 1869, then the jury should find for the defendants."

These instructions present questions of law upon which we do not feel that it is necessary to pass. They refer to the possession of Jasper Sutherland between 1864 and the date of William Sutherland's deed to him in 1887, and even if it were shown that they were erroneous, the error ought not to affect the verdict of the jury, for if, as we have held, there was no error in the ruling of the Circuit Court upon the admissibility of evidence, then from the date of the deeds of William Sutherland to Jasper Sutherland, in January, 1887, and February, 1888, Jasper held adversely to all the world under color of title, and at the date of the institution of this suit that adversary possession in Jasper and his vendee, William B. Sutherland, had continued for more than fifteen years, and had ripened into a good title; and upon the facts the jury could not have found any other verdict.

There were several other instructions given at the instance of defendant in error, which were excepted to.

The third of those instructions is as follows: "The court instructs the jury that, even should they believe that E. T. Sutherland did not claim one-half of the coal in controversy between the year 1883 and the date of the sale of his interest to his brother Jasper, that fact shall be treated by the jury as wholly immaterial in this case."

This is certainly true if the view we have taken of the case be correct, and the rejection of this instruction was proper.

What was said with reference to the third instruction applies with equal force to the fourth.

The other instructions given at the instance of defendant in

error are free from objection, and do not require extended discussion.

Plaintiff in error asked for several instructions, which the court refused to give. The first should not have been given because it is predicated upon the idea that Jasper Sutherland did not claim the coal and other minerals in and under the land, when the proof is positive to the contrary. The refusal of the second is, in our view of the case, to say the least of it, immaterial, because it states that Jasper Sutherland had no color of title to the land in controversy until January, 1887, and that defendants could not rely upon adversary possession prior to that date, which is the view upon which we have decided the case. The other instructions are all predicated upon evidence which we have held was properly excluded.

We are of opinion that the judgment of the Circuit Court should be affirmed.

UPON A REHEARING, JUNE 28, 1906.

Absent, Keith, P.

BY THE COURT:

This case is before us upon the award of a rehearing to a former decision rendered November 23, 1905.

The principal assignment of error to which our attention has been directed in the petition for a rehearing grows out of a conclusion of the court, founded upon an incorrect copy of the certificate of acknowledgment to an agreement between Jasper Sutherland and others, of the one part, and F. A. Stratton, of the other part, dated October 7, 1887. It appeared that Jasper

Sutherland's name and cross-mark, unattested, was attached to the agreement, but his name did not appear in the certificate of acknowledgment.    Upon that record the court, therefore, held that notice of the contents of the agreement could not be imputed to Jasper Sutherland, and that the paper was rightly excluded from the evidence.    Thereupon, the plaintiff in error presented its petition for a rehearing, calling our attention to the fact that Jasper Sutherland's name did appear in the original certificate, and was by mistake transcribed as *"Joseph Sutherland"* in the former record; and assigned that and other reasons as grounds for rehearing the decision.

In considering the ruling of the court with respect to the exclusion of the Stratton agreement, to appreciate the signifi-- cance of that decision it is proper to remark that the trial court had already excluded the record of the suit in equity instituted by Joseph Kelly and others against the heirs of Dale Carter and Mary Campbell for the purpose of setting aside the Imbo-- den compromise, which compromise agreement was filed as an exhibit with the rejected record.    For reasons satisfactory to the court the action of the Circuit Court in ruling out that record was affirmed.    It is clear, therefore, that the rejection of the Stratton agreement and power of attorney was corollary to the previous ruling.

The sole purpose for introducing the Stratton agreement and power of attorney was to affect Jasper Sutherland with notice of the Imboden compromise; but the court had already held that the Imboden compromise and the suit brought to annul it had no place in this record; and *a fortiori,* subordinate papers in relation to the same subject matter were likewise immaterial and inadmissible in an action of ejectment.

The objection to the introduction of these documents was general, and, if for any reason they were inadmissible, the

ruling of the trial court in excluding them must be sustained. While basing the rejection of the Stratton agreement upon a different ground from that upon which it was rested in the former decision, we are, nevertheless, of opinion that it was rightly excluded.

It may also be observed, as affecting the probative value of the Stratton agreement, that it bears date October 5, 1887, whereas the deed from William Sutherland to Jasper Sutherland was executed January 15, 1887, about nine months previously. In this connection the court, in its former opinion, observes: "The evidence is clear and conclusive that from January, 1887, until the institution of this suit on the 13th day of October, 1902, a period of more than fifteen years (the limitation being only ten years west of the Alleghany mountains), Jasper Sutherland and his vendee had been in the open, notorious, exclusive and hostile possession of the land in dispute."

For the purpose merely of excluding a conclusion we desire to say that nothing in the discussion of the *factum* and the acknowledgment of the Stratton agreement in the former opinion of the court was intended to alter or modify the rule enunciated in *Board of Supervisors, etc.,* v. *Dunn,* 27 Gratt. 608, and that line of authorities, to the effect that "A person who signs, seals and delivers an instrument as his deed will never be heard to question its validity upon the ground that it was not acknowledged by him nor proved at the time of delivery. It is the sealing and delivery that gives efficacy to the deed, not proof of its execution. And this principle applies to all bonds, whether executed by public officers or private persons, unless there is a statute making the acknowledgment or proof in court essential to the validity of the instrument."

The remaining grounds alleged in the petition to rehear have been sufficiently discussed and disposed of in the opinion of the

court on the former hearing, and do not demand further notice.

For obvious reasons we cannot comply with the request of counsel to declare, if we should be of that opinion, that plaintiffs in error have an equitable title to the minerals underlying the land in controversy. The functions of this court are exhausted when it has ruled upon the specific assignments of error submitted, and a mere advisory opinion, touching extraneous questions, expressed for the purpose of influencing future litigation, would be gratuitous and unwarranted.

Upon the whole case, we are of opinion to adhere to the previous decision, and to affirm the judgment of the Circuit Court.

*Affirmed.*