Carr, J.
This case involves several very important questions, which I shall consider in the order they were discussed at the bar.
First, then, as to the charities. The attorney general filed an information and bill, to have them applied to the objects'for which they were bequeathed, and to enforce the execution of the trusts in respect to them; and the chancellor considering them good and valid, decreed them. It was contended in the argument that this decree was erroneous, because the devise and bequests were vague and indefinite, and therefore void. Let us examine this. The pecuniary legacies of 4000 dollars are, in effect, given to the roman catholic congregation, but for the building and support of a chapel; and the ground is given to trustees to permit the roman catholics to build a church cm, for the use of themselves, and all persons of that religion, residing in Richmond. The bare statement seems sufficient to shew, that under the general rule, as applicable to ordinary legacies, these would be void. Who are the beneficiaries ? the *462 roman catholic congregation residing in Richmond. And who are they? Suppose you name them to-day : are those the same persons who constituted the congregation yester- • • day? or who will constitute it to-morrow? Will none re-from 0r come to Richmond, to reside? Will none be converted to or from the roman catholic religion ? For it is to the roman catholic congregation for the time being, ^at ^ legacies are given. This however is a point which need not be pressed; for it was not pretended, that they could be supported, as legacies to individual persons. But it was strongly insisted, that as charitable legacies they were entitled to the aid and protection of a court of equity; and the practice of the english courts, in similar cases, was referred to in proof of the position. The course of decisions in England was admitted on the other side, but it was contended, that they rested intirely on the statute of charitable uses, 43 Eliz. and did not at all belong to the ordinary powers of a court of equity. This was the only serious question. I certainly shall not discuss it; for I find this completely done to my hand, by chief justice Marshall, in the case of The Baptist Association v. Hart’s ex’ors. The cases cited and examined, and the reasons given by him, proveycwioluskely to my mind, that in England, charitable bequrosts/’-wher^ '"fro legal interest is vested, and which are too vague to be claimed by those for whom the beneficial mterestv.wa?/^t¡érfded, cannot be established by a court of equity, either exercising its'ordinary jurisdiction, or enforciog-fh&-prer<%atq¡$ of the king as parens patria, independently of .the jsicatute 43 Elizabeth; and as that statute, if ever in’force here, was repealed in 1792, I conclude that charitable bequests stand on the same footing with us, as all others, and will alike be sustained, or rejected, by courts of equity. I think the bill of the attorney general must be dismissed.
We come now to the other questions arising between some of the legatees and the executors. There can be no doubt, that the specific legacies are first to be delivered. *463 Next in order, are the legacies of 50,000 dollars to the testator’s Spanish relations, 15,000 dollars to P. J. Chevallie, and the legacies given to the slaves emancipated by the will. The legacies of this class amount to 69,600 dollars. The testator, then, after directing all the residue of his estate to be converted into money, directs his executors to pay, out of • r , 1 , , . • • , it, Ins lunera! expenses, and their own commission; then, twenty six legacies to as many legatees, amounting 114,000 dollars, and all legacies which he should bequeath by codicil; and lastly, he creates another residuum, which he bequeaths to residuary legatees. Then come eleven codicils, giving pecuniary legacies to an amount exceeding 47,550 dollars. I think the twenty six legacies bequeathed by the will, out of the first general residue, and the pecuniary legacies bequeathed by the codicils, stand all on the same footing. From the passage directing that Mrs. Fisher should be paid her legacy as soon as possible, knowing she was in need, and another in the first codicil, saying that as to the payment of the legacies left by his will, he directs his executors to begin to pay those that they think most in need, and a similar direction as to his brother Francisco’s legacy, it was contended, that the testator meant to place Mrs. Fisher, and those who should be thou ecutors most needy, on higher ground tjáro]j|h^3JiiVív(! tees, and to authorize the executors to pi* them in prefe* ence to the others, in case of a delicien said to be rendered more clear, by that «ause in the fourth codicil, by which he “ desires his exeqk«»IIBl^®i^s best judgement in making the sales of his^al^^ate^aníf not to hurry them, as it might create sacrifices.” cut I do not think that the testator ever intended such preference, or dreamed of such deficiency. lie believed that the fund would he abundant for all the legacies; and only feared, that to hurry the sales at an unfavourable time might injure his Spanish relations, who wore to have the residuum. He wished this residuum as large as possible, and therefore cautioned the executors; but he never thought about exclusive *464 preferences among the second class of legatees. The ex- • ccutors however have gone on to pay some of the legatees intirely, others partially; and it is now discovered, that the fund will fall far short of paying all the claims upon it. In this state of things, the unsatisfied legatees insist, that the executors are liable to them, for their fair and equal propor- . , x . tion, of the whole fund; while the executors contend, that they must be credited by the full amount of all legacies, or parts of legacies paid, leaving the unpaid legatees to make those who have been overpaid, account to them for the excess. I have the fullest confidence, that the executors have proceeded honestly in this business; but, assuredly, most incautiously. They had the fund in their hands; the will for their guide; and the best counsel at their call: they could have secured themselves, either by paying pari passu, or by taking bonds to refund, or by bringing the whole affair under the control of the chancellor. The legatees could do nothing to prevent improper disbursements: their claim was against the executors alone ; and they have made it by suit. Would if not now be most cruel injustice to tell them, the executors, to be sure, ought to have paid you your proportion of the fund; but they have, by mistake, paid it to other legatees; and your only remedy, now, is to seek them over the face of the earth, and call them to account? I can never agree to tell them so. I think it but simple justice to give them a decree against the executors for their fair proportion of the whole fund, and let the executors if they can (a question which I pass by, as it is not before us) recover from the over-paid legatees. It was also contended, that the defect of assets resulting from the general and rapid fall in the value of property, presents a case, where equity will relieve executors from the effects of what the law would call a devastavit: and the cases from 11 Yin. abr. 430. and 1 Chan. Ca. 19Ó. are cited. In one, the property was consumed by the great fire in London; in the other, it was taken away by the restoration: these were cases in which no vigilance or prudence of the executor *465 could have protected him. But the case before us is different; safety was perfectly in the executors' power.