Syllabus.

# Richmond.

## ROLLER v. MURRAY AND OTHERS.

### November 21, 1907.

Absent, Cardwell, J.

1. EQUITY PLEADING—*Amendments.*—If a plaintiff misdescribes his contract in his original bill, or omits to mention a subsequent modification, or a re-execution of the contract sued on, the error or omission may be corrected by amendment before an answer is filed or evidence taken; and even where the evidence disclosed a misdescription of the contract sued on, the complainant may be permitted to amend his bill to conform to the proof.

2. EQUITY PLEADING—*Demurrer—Consideration of all Pleadings and Exhibits.*—Though a supplemental bill should intend to deny a material fact set forth in the original bill, and supported by exhibits filed therewith, the court is not bound on demurrer to give effect to such intendent, if the contrary appears from the complainant's exhibits or from his case as a whole, but will interpret for itself the documents and contracts exhibited, in the light furnished by their own provisions and surrounding circumstances, and in the light of the other exhibits and the other allegations of the pleadings.

3. CONTRACTS—*Champerty—Present Status.*—A contract by an attorney to undertake and carry on litigation at his own risk, or without costs to his client, for a share of the recovery, is contrary to public policy and void. The law of champerty as affecting civil contracts is not obsolete and inoperative in this state, nor is it affected by the repeal by implication of the statute, declaratory of the common law, making champerty a criminal offense.

4 CONTRACTS—*Champerty—Purging Illegality.*—Where a champertous contract has been entered into between attorney and client, and, after a large portion of the property has been recovered under it, the parties reduce the contract to writing embracing the whole property originally in dispute and therein stipulate that all expenses shall be paid out of the proceeds of the land recovered, and that the attorney shall indemnify and save the client harmless against all costs, the contract is not purged of its illegality, even

though the land already recovered be sufficient to pay such costs.

5. CONTRACTS—*Champerty—Parties—Privies*—A donee of land who agrees to "take the shoes" of the donor in a champertous contract with an attorney for the recovery of the land, is not a stranger to the contract, and may set up the defense of champerty to a suit by the attorney for his share of the recovery.

6. CONTRACTS—*Champerty—Quantum Meruit—Equity.*—Whether an attorney, who fails to recover on a champertous contract can recover on a *quantum meruit*, cannot be determined in a suit in equity instituted by him which goes out of court on a demurrer for lack of equity.

7. CONFLICT OF LAWS—*Contracts for Land—Champerty.*—Whether a contract for the recovery of land situated in Virginia is champertous or not, is to be determined by the laws of Virginia.

8. EQUITY PLEADING—*Amendments.*—Where a bill has been twice amended, the evidence taken, and the case fully heard and decided on its merits, further amendments, offered without explanation or excuse, are properly rejected.

9. EQUITY JURISDICTION—*Land in Another State.*—A court of equity in this state cannot decree the sale of land lying in another state.

Appeal from a decree of the Circuit Court of Rockingham county. Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Sipe & Harris* and *John E. Roller,* for the appellant.

*Conrad & Conrad, Holmes Conrad* and *D. O. Deckert,* for the appellees.

KEITH, P., delivered the opinion of the court.

In this case there was a demurrer to the bill in the circuit court, which was sustained and the bill dismissed. Appellant then asked leave to amend his bill, which the circuit court denied, and in support of its decree, dismissing the bill upon demurrer and rejecting the offer to amend, the judge of the

circuit court filed two opinions, which deal with the subject in a manner so satisfactory that we feel that we cannot do better than to adopt them, making only slight verbal changes.

"This cause comes on to be decided on a demurrer filed by Mary H. Murray to the bill, as amended by an amended bill filed in 1902, and as amended and supplemented by an amended and supplemental bill filed April 27, 1906.

"The grounds assigned for the demurrer go both to the character of amendment (it being objected that the new matter introduced by way of amendment makes a new and different case from that presented by the original bill), and to the merits of the case presented by the bills and the exhibits filed with them (it being insisted in this behalf that the contract set up by complainant and relied on as the foundation of the claim he invokes the powers of the court to enforce, is champertous and void). In view of the conclusion I have reached upon the latter question, it is hardly worth while to pass upon the question of pleading. I may say, however, that I consider the amendments made as well within the privileges of our practice with respect to amendments.

"All three of the bills assert, as the gravamen of the plaintiff's case, an equitable right to one-fifth of the purchase price arising on the sale of the Hollingsworth lands by Mrs. Murray to Geo. A. Wheelock (apparently relying on an equitable assignment, though without so naming the equity claimed), and to the benefit of the security of the deed of trust given by Wheelock upon the land to secure the purchase money; notice to Wheelock of the plaintiff's rights being alleged, and the prayer of all the bills being that these rights be established by the court, and that the Wheelock deed of trust be enforced for plaintiff's benefit, notwithstanding the subsequent release of that deed and of Wheelock by the act of Mrs. Murray.

"The averments relative to the contract with Miss Emily Hollingsworth, which constitutes the foundation of the equity asserted and the relief sought, do vary slightly in the various.

bills, but not, in my judgment, in any material respect affecting the character of the claim asserted or the relief sought. They each, if valid, result in giving the plaintiff the equity he claims, to-wit: a right to a one-fifth share of the proceeds of the sale of the lands. If a plaintiff misdescribes his contract in his bill, or, in his original bill, omits to mention a subsequent modification, or a re-execution of the contract sued on, he can certainly correct the error or omission by amendment before an answer is filed or evidence is taken; and even after the taking of evidence discloses the fact that the contract forming the subject matter of the suit was different from that described in the bill, the plaintiff may be permitted to amend his bill to conform to the proofs.

"The argument of counsel was more particularly addressed at the hearing to the validity of the contract or contracts set forth in the plaintiff's pleadings and exhibits as the foundation of his claim, as affected by the question of champerty; and this question is one of more serious concern.

"I cannot agree with the idea suggested in the argument, that the whole law of champerty is obsolete and inoperative in Virginia. The latest legislative enactment relative to counsel fees is section 3201a of Pollard's Code (Acts, 1904, p. 263), the last paragraph of which is in these words: "Provided, that nothing herein contained shall affect the existing law in respect to champertous contracts." The old conception that a contract by an attorney for a contingent fee came under the ban of the law against champerty, has been repudiated in many of the American states, and among these in Virginia. In very few, if any, jurisdictions, however, is it held that a contract by an attorney to undertake and carry on litigation at his own risk as to costs, in consideration of a share of the anticipated recovery, is not contrary to the policy of the law, champertous and void.

"No question of this sort was decided or raised in the case of *McDonald* v. *Logan*, 2 Va. Dec. 687, 34 S. E. 490, (cited by counsel for complainants). That was not a suit to enforce a

claim for counsel fees. It was a suit brought by the client (Logan) against his counsel to recover of them the proportion of the charges which had come out of his share of a certain fund administered by West Virginia courts in the course of litigation in that state, the relief being demanded by Logan against his counsel on the ground that, under his contract with them, his counsel were to receive fifty *per cent.* of the recovery, and out of it pay all costs and charges. The counsel had already received their compensation, and the suit was by the client to recover back a portion of it. No question of champerty was raised, but the recovery claimed was denied.

"The latest expression of our court of appeals on the subject of champerty is found in the case of *Nickels* v. *Kane,* 82 Va. 309, in which it is said: "champerty may be defined to be a bargain with the plaintiff or defendant in a suit for a portion of the land or other matters sued for, in case of a successful termination of the suit, which the champertor undertakes to carry on at his own expense; and champerty avoids the contracts into which it enters.' And it is expressly stated further on in the opinion, that the principles of the common law with reference to champertous contracts remain in force in Virginia.

"So far from being obsolete law is it, that there are many late cases in the various states of the Union, and in the Federal courts, in which the law has been applied, and the cases and text-writers are practically uniform in holding that a contract by an attorney to undertake and carry on litigation at his own risk, or without cost to his client, for a share of the recovery, is contrary to public policy and void. The following are instructive cases on the subject: *Peck* v. *Heurich,* 167 U. S. 624, 42 L. Ed. 302, 17 Sup. Ct. 927; *Johnson* v. *Van Wyck,* 4 App. D. C. 294, 41 L. R. A. 520; *Greer* v. *Frank,* 179 Ill. 570, 53 N. E. 965, 45 L. R. A. 110.

"The employment undertaken by the complainant in this case was the recovery of 52,000 acres of mountain land, known as the Hollingsworth survey, which had been sold for taxes dur-

ing the war, and was, at the time of the contract in question, held adversely by various claimants thereof under hostile titles. The complainant stated orally at the argument, that the number of adverse holders was about 200.

"The original contract between complainant and his client, Miss Emily Hollingsworth, of Philadelphia, appears from the amended bill, filed in 1902, to have been made by correspondence, the letters evidencing the contract being Exhibits 1, 2, and 3 filed with that bill, and prayed to be read as part of it. The first of these letters is one from R. C. McMurtrie, the attorney and agent of Miss Hollingsworth in Philadelphia, to General Roller, dated January 24, 1873, and it states the conditions of the proposed employment in distinct terms, saying: 'Miss Hollingsworth will agree to give you one-fifth of the net proceeds of all lands recovered, you paying all expenses of the litigation that may be necessary for that purpose, so that she is required at no time to pay any money for anything connected with the business.'

"To this letter the complainant wrote an answer (Exhibit 2) on February 1, 1873, in which he said: 'I regard your letter of the 24th as a substantial acceptance of my terms. I ask two limitations upon the proposition contained in your letter. First, that Miss Hollingsworth shall bear the expense of any proceedings that may be necessary in Philadelphia—it appears elsewhere that Miss Hollingsworth was not at that time the owner of the legal title, but had to acquire it. I will bear all expense in Virginia connected with the suit, but am not willing to pledge myself to any expenses outside of the state, because I can't anticipate the amounts of them. Second, that my interest in the land shall not be sold, unless I agree to the price. As your letter reads, she could sell at any price, and I must be content with my share of the *"net proceeds."* By net proceeds, I presume you mean proceeds after deducting expenses of suit and sale.'

"On February 3, 1873, Mr. McMurtrie answered the letter of

General Roller, accepting the limitations or qualifications pro-posed by him. These letters evidence the consummation of a contract, which, it is alleged, was authorized and approved by Miss Hollingsworth.

"The contract effected by them fulfills completely the defini-tion of champerty, and falls under the prohibition of the law. That the contract so evidenced was the original contract of complainant's employment, under which he acted and instituted various actions to recover the lands in question, is not negatived by the averments of the supplemental bill, as I construe them. If the supplemental bill were so intended, I conceive that the court would not be bound on demurrer to give effect to such in-tendment, if the contrary appeared from the plaintiff's exhibits, or from his case as a whole, but would interpret for itself the documents and contracts exhibited, in the light furnished by their own provisions and surrounding circumstances, and in the light of the other exhibits and the other allegations of the pleadings.

"The three letters filed as Exhibits 1, 2 and 3 themselves evince a contract, and the amended bill proceeds: 'Subsequently your complainant, acting as the attorney for the said Emily Hollingsworth, by the institution of suits and otherwise, re-covered the whole of said tract of land from those holding the same adversely, and he thus became entitled to the compensa-tion which had been agreed upon between him and the said Emily Hollingsworth under the contract aforesaid.' And in Exhibits Nos. 5 and 6 (filed with the amended and supple-mental bill), being letters from complainant to Miss Hollings-worth, dated May 31, 1875, and June 3, 1875, the complainant refers to a tract of 10,075 acres which had, at that time, been recovered, and encloses to her a deed to be executed by her, to convey to him a one-fifth interest therein, saying in the letter of June 3, 1875: 'As to the deed which I enclose to you, you will find that it is in exact accordance with Mr. McMurtrie's offer to me by letter of January 24, 1875, and my letter of ac-

ceptance February 1, 1873,' and later in the same letter, 'I agree with you in thinking there ought to be a regular contract in writing between us, signed and acknowledged, and will prepare one if you wish it. I have rested content with Mr. McMurtrie's letters, knowing that he would do just what he had promised for you.' The amended and supplemental bill does seek to mitigate the force of the exhibits evidencing the original contract, and avers that the reference to them in the amended bill has been misunderstood, in that they have been supposed to 'embody the contract intended to be referred to in them, *the contract upon which this complainant has brought this suit,* when, in fact, it was subsequently made and entered into in writing between the said Emily Hollingsworth and this respondent.' I understand this averment to mean, not that the contract evidenced by the letters never existed, but that the contract was later reduced to the form of a written instrument, upon which latter complainant bases his claims. The written contract, subsequently signed by the parties, is filed as Exhibit No. 4, with the amended and supplemental bill. It bears date July 10, 1875, and is manifestly the contract to be drawn, alluded to in General Roller's letter of June 3, 1875, (Exhibit No. 6), in which letter Exhibits Nos. 1, 2 and 3 (the letters of 1873) are referred to as evidencing the contract existing between the parties, and the contract which it was proposed to reduce to the form of a signed instrument.

"Exhibit No. 7 is a letter from General Roller to Miss Hollingsworth, dated July 7, 1875, in which he says: 'I enclose our agreement prepared in accordance with your request. I enclose duplicate copies. Retain one and enclose the other to me. Please have Mr. McMurtrie to examine it in connection with our letters of January 24, 1873, and February 1, 1873, respectively.' Here the letters of 1873 are again invoked as the evidence of the contract existing between the parties, and to verify the correctness of the written instrument enclosed to be signed. The amended and supplemental bill alleges that the

written instrument was signed, and that that is the contract on which this suit is brought.

"Is this contract free of the illegality of the original undertaking? If it is ambiguous in respect to the matter of costs and expenses, it is to be construed in the light shed upon it by Exhibits 1, 2 and 3, and the correspondence attending its preparation and execution, and these, I think, leave no room for doubt about the question. It is to be remembered also that the employment of the complainant, as evidenced by the letters, took place about February 1, 1873, while Exhibit 4 is dated July 10, 1875; so that nearly two and a half years had elapsed between the commencement of his connection with Miss Hollingsworth as her counsel and the execution of Exhibit 4, and in this interval of time much had been done in the performance of his undertaking to recover the land.

"Exhibit 4 recites that of the 52,000 acres of land there had already been recovered the Loose tract of 13,800 acres, the Davis tract of 2,700 acres, and the Gray J. Peyton tract of 10,075 acres, aggregating in all 26,575 acres.

"With respect to costs and expenses, Exhibit 4 contains the following provisions: 'Emily Hollingsworth agrees to pay * * * all expenses which may be incurred in the expected litigation outside of Virginia, all expenses in Virginia of the litigation that may be necessary, and expenses of any sale that may be made, are to be paid out of the proceeds of the lands recovered. Emily Hollingsworth is to be at no time required to pay any money for anything connected with the litigation in Virginia. If these expenses are paid by John E. Roller, he is to be reimbursed out of the proceeds of the land recovered.' The contract in terms covers the whole 52,000 acres of land, applying to those portions which had at that time already been recovered as well as to those portions yet in controversy; and I am disposed to agree with counsel for complainant that the lands already recovered furnished the means, under the terms of the contract, to the extent of their value, for the payment of costs

attending the unfinished litigation, as well as the costs of that which was ended. Yet, if this is so, it is in exact conformity with the original contract evidenced by the letters of 1873, by which it was agreed that General Roller should have one-fifth of the net proceeds of the land, meaning by net proceeds, as stated, 'proceeds after deducting expenses of suit and sale.'

"Under the circumstances recited, I am unable to perceive how the signed writing of July 10, 1875, can be considered a new contract, purged of the illegality that inhered in the old. It was obviously intended as a reduction to formal writing of the agreement evidenced by the letters, and it conforms to and ratifies that agreement. Under the original agreement, the complainant was to be reimbursed his outlay for costs and expenses, in the event of success, out of the lands recovered, and the paper of July 10, 1875, recognizes this fact and applies it to the existing situation. There are other considerations affecting the paper of July 10, 1875, which bring about the same result. If it were the only evidence of the contract between the parties, the first and last, would it not be open to the same objection of illegality? In it General Roller distinctly undertakes to institute and carry on litigation to recover the 52,000 acres of land, and in it he and his client distinctly stipulate that the latter 'is to be at no time required to pay any money for anything connected with the litigation in Virginia. If these expenses are paid by John E. Roller, he is to be reimbursed out of the proceeds of the land recovered.' Here the client is distinctly indemnified against costs by the counsel, and such a contract is no less champertous than one in which it is affirmatively provided that counsel shall stand the costs. 6 Cyc. p. 858 *et seq.;* 5 Am. & Eng. Enc. Law (2nd ed.) 829.

"It is urged by counsel against this construction, that the contract made the land recoverable liable for costs and charges, and that enough has already been recovered at that time (July 10, 1875) to answer this purpose. But the client was none the less indemnified against liability, and the land might prove

inadequate for the purpose. This was sufficiently within the range of possibility to make the matter of the client's exemption the subject of an express stipulation. It appears that the land was wild mountain land, having only a speculative value, while the suits to be brought were of a kind attended with heavy expense. Moreover, if this contract is to be construed as having relation in date to the commencement of complainant's connection with Miss Hollingsworth as her counsel (as argued in his behalf), then at that time no land had been recovered, and the whole undertaking was at complainant's risk as to cost by the clause exempting Miss Hollingsworth from liability.

"Viewing Exhibit No. 4 again, from the standpoint of its own date (July 10, 1875), it binds Miss Hollingsworth to compensate General Roller with one-fifth of the lands, of all the 52,000 acres recovered or to be recovered. For what? Certainly not only for the services to be rendered in the future in connection with the unsettled controversies affecting those portions of the land then not yet recovered—aggregating about 25,000 acres—but manifestly in consideration of his services rendered and risks assumed under the contract of 1873, and in and about the recovery of the 26,575 acres which, on July 10, 1875, had already been recovered, and his services rendered and risks assumed under the provisions of the same contract in and about the proceedings looking to the recovery of those portions of the land which had not yet been recovered in 1875, as well as the services still to be rendered when Exhibit 4 was signed.

"A bond given for a fee due under a champertous contract is void, and so likewise is any other contract for such a consideration. Neither is the contract of July 10, 1875, severable so as to distinguish the valid from the illegal parts, even if it were held to be an independent contract without vice of its own, so far as future transactions were concerned. It would be impossible to determine to what extent the services rendered and the risks assumed by the complainant under the contract of 1873 operated as the consideration for the promise to pay him

one-fifth of the lands yet unrecovered in 1875. The contract of 1875 is an entire thing, and the illegality of the original contract is inseparably a part of it. *Trist* v. *Child,* 21 Wall. 441, 22 L. Ed. 623.

"As a further argument against the demurrer, it is insisted by counsel for complainant that the demurrant, Mrs. Murray, is a stranger to the contract, and that a stranger to an illegal contract cannot set up the illegality as a defense.

"The abstract proposition of law, as stated, is doubtless correct, but I do not think the authorities sustain the application of the principle to the situation of this case. The rule applies *when the illegality does not appear* on plaintiff's own showing, but is brought into the case in an affirmative way by the defendant as matter of defence, as by plea or answer, or where the illegal contract is collateral to the matter in suit. When the illegal contract is the substance of his suit, and the illegality appears by the plaintiff's pleadings, and a demurrer is interposed, or the question is otherwise brought to the attention of the court, the law is, I think, that the illegality thus appearing will defeat the suit.

"The case of *Johnson* v. *Van Wyck,* 4 App. D. C. 294, 41 L. R. A. 520, decided by the District of Columbia Court of Appeals, is a learned and instructive authority on this question, and on pages 528 and 529 a number of eminent judges are quoted at length in support of the decision. The case of *Peck* v. *Heurich,* 167 U. S. 624, 42 L. Ed. 302, 17 Sup. Ct. 927, also illustrates the rule; and this result would seem to follow necessarily from the general principles of equity relative to illegal contracts. 2 Pom. Eq. Jur. (3rd ed.) secs. 936-939.

"If Miss Hollingsworth had conveyed the land to Mrs. Murray in consideration, or on condition, that she should pay to General Roller one-fifth of the proceeds realized on a sale of it, or that the grantee should hold a one-fifth interest as trustee for General Roller's use, Mrs. Murray could not have pleaded to a suit by General Roller to enforce the provisions of this deed

for his benefit, that the benefit accruing to him under the deed was the result of a former champertous contract between General Roller and his grantor. In that case, he would rely upon the deed and the contract evidenced by it, and the consideration which moved Miss Hollingsworth to make these provisions would not appear, and Mrs. Murray would not be allowed to bring it in as an affirmative defense for the purpose of relieving herself from the obligation of a legal contract between herself and her grantor.

"I do not regard Mrs. Murray, however, as a stranger. On the contrary, she is a privy in estate to Miss Hollingsworth, her grantor, and a privy also to the contract with General Roller. The bills allege (original and amended) that Miss Hollingsworth made a deed of gift of the land to Mrs. Murray, the latter 'agreeing to carry out the contract' between complainant and Miss Hollingsworth. In Exhibit No. 52 with the supplemental bill, being a letter of November 18, 1892, to General Roller, Mrs. Murray says, that when Miss Hollingsworth deeded the land to her, it was with the distinct understanding that the contract with General Roller was to be 'as binding upon me' (Mrs. Murray) 'as it had been upon her,' (Miss Hollingsworth), and continues: 'I would suggest that you prepare a simple statement, showing that we stand in Miss Hollingsworth's place as regards the former contract, and we will submit such paper to Mr. McMurtrie for approval, and if he thinks it the thing for both sides, we will then sign it;' and in General Roller's reply of December 19, 1892, to Mrs. Murray (Exhibit No. 53) he says: 'You say that you have heretofore given me assurance that you had received the deed with the distinct understanding that my contract with Miss Emily should be as binding upon you as upon her. You are simply mistaken— such assurance would have been acceptable to me and would have satisfied me for a reasonable time, and perhaps until now, but what seemed a studied refusal on your part to acknowledge the fact in a formal way, was far from satisfactory. If you

are to take the shoes (as we lawyers say) of Miss Emily Hollingsworth, all right.' It furthermore appears, that at the time of the conveyance to Mrs. Murray the litigation involved in the recovery of the land had not ended. The bill says this conveyance was made on or about April 1, 1889. In the letter of General Roller of December 19, 1892, (Ex. 53), after expressing his satisfaction for the present with Mrs. Murray's assurance as to his contract being as binding upon her as it was upon Miss Hollingsworth, he says: 'I shall at once push the Nelson case to trial, and when that is ended, shall demand a formal deed;' that is, the deed for the one-fifth interest he had repeatedly asked for. And in Mrs. Murray's letter to General Roller of November 18, 1892, (Ex. 52), she speaks of General Roller as her counsel, and makes inquiry about the Nelson case. It would seem, therefore, that Mrs. Murray is not only a privy in estate to Miss Hollingsworth, with the right to make any defense to General Roller's demand that Miss Hollingsworth could have made (*Green* v. *Kemp,* 13 Mass. 515, 7 Am. Dec. 169, and notes), but that she expressly took over the contract to be bound as Miss Hollingsworth was, taking Miss Hollingsworth's shoes in the contract with General Roller's consent, and became his client, under the terms of the contract, before the litigation was ended.

"It is also urged on behalf of complainant, that, even if he cannot recover on the contracts alleged in his pleadings, he is entitled to recover reasonable compensation for his services on a *quantum meruit.*

"There are authorities both for and against this proposition, but the question is not one to be decided in this case. Any claim upon a *quantum meruit* is a legal demand, to be asserted at law. The doctrine that when a court of equity once acquires jurisdiction of a cause, it will do full justice between the parties, though, in doing so, it has to administer and decide rights properly pertaining to the common law jurisdiction, does not

apply to the case of a bill which goes out of court on a demurrer for want of equity.

"It is incidentally mentioned as a matter of evidence in the amended and supplemental bill, and alluded to in the briefs for complainant, that General Roller obtained a deed of conveyance from Miss Hollingsworth for a one-fifth interest in a certain tract of 10,075 acres lying in West Virginia, part of the 52,000 acres; and that this deed was returned to Miss Hollingsworth for certain purposes and never returned to him.

"I do not understand that this circumstance is brought forward as an independent ground of relief as to the one-fifth interest in the particular land concerned. The pleadings are not framed with a view to relief on that account, and this court would be wanting in territorial jurisdiction.

"The court is of opinion to sustain the demurrer and dismiss the bills, and that the injunction heretofore awarded on the prayer of the amended and supplemental bill be dissolved."

When the opinion of the circuit court was rendered upon the demurrer to the amended and supplemental bill, appellant offered another amended and supplemental bill, which offer resulted in a re-argument of the cause, upon which the circuit court filed a second opinion, as follows:

"On the re-argument of this case, two grounds, not before advanced, were urged by the complainant to induce the court to change its decision. The first was, that the act of December 8, 1792, (1 Rev. Code, 1819, p. 538), defining the offense of champerty and prescribing its punishment, was repealed by its omission from the revisal of 1849; and that the effect of this repeal by implication was not only to repeal the statute, but to repeal the common law, of which the statute is claimed to have been declaratory only; and, therefore, that there is no law against champerty in Virginia to-day. The opinion of Judge Tucker in *Gallego* v. *Attorney General,* 3 Leigh, 476, 24 Am. Dec. 650, is cited in support of this proposition.

"In that case Judge Tucker said that, if there was any com-

mon law doctrine giving validity to indefinite charities, it was completely covered by the provisions of 43 Eliz.; and. that, therefore, although it should be admitted that certain indefinite charities were recognized at common law, yet as the statute also comprehended them and was itself repealed, the .common law was repealed *eodem flatu* with the statute. None of the other judges touched upon this question, and it would seem from an examination of the whole case, that the decision of the court rested upon the proposition that the gift in question was void at common law, and not by reason of the repeal of the common law. Certainly, this has been the view taken of that decision by both courts and law-writers.

"In 2 Minor's Insts. (3rd ed.) p. 1056, it is said: 'In England very much more indulgence is manifested to indefinite charities than to other indefinite gifts and devises; and this diversity was long attributed not to the common law, of which some thought the statute of 43 Eliz. c. 4, merely declaratory, but to the terms of that statute, which most supposed to have introduced a new doctrine. *It was under this latter view of the law that the earlier Virginia cases* (mentioning *Gallego* v. *Attorney General, supra,* and also *Baptist Association* v. *Hart,* 4 Wheat. 1, 4 L. Ed. 499), were adjudicated. But, upon an investigation of the ancient records in the Tower of London, it was discovered that in very many cases prior to the statute of 43 Eliz. c. 4, a similar discrimination in favor of charities had prevailed in equity, and that 43 Eliz. was little more than affirmatory of the common law. Virginia, *notwithstanding this development of the mistake upon which her earlier cases had proceeded,* yet did not think fit to recede from the doctrine those cases had established.'

"This same view, as to the ground upon which the decision in *Gallego* v. *Attorney General, supra,* rested, was taken by the court of appeals in the case of *Fifield* v. *Van Wyck,* 94 Va. 570, 27 S. E. 446, 64 Am. St. Rep. 745; in the *Churchman case,* 80 Va. 718; and in the *Guthrie case,* 86 Va. 125, 10 S. E. 318,

6 L. R. A. 321, and also by the Supreme Court of the United States, in *Vidal* v. *Girard,* 2 How. 127, 11 L. Ed. 205, and in, *Russell* v. *Allen,* 107 U. S. 163, 27 L. Ed. 397, 2 Sup. Ct. 327.

"From all these authorities, and others that might be cited, the opinion is manifest that, but for the error which the Supreme Court of the United States fell into in the case of *Baptist Asso'n* v. *Hart, supra,* and which the court of appeals of Virginia fell into in *Gallego* v. *Attorney General, supra,* as to what was the common law, the decision of the latter case would have been different. In none of them is it conceded or considered that the repeal of 43 Eliz. would have operated a repeal of the common law with respect to indefinite charities.

"It may be true that the express repeal of a statute which is declaratory of the common law—which reduces the whole of the common law on a given subject to statutory form—would operate a repeal of the common law, but it would seem to be contrary to sound reason and to the usual rule of interpretation to allow that effect to an implied repeal of a statute arising out of the omission to embody the statute in a revision, and especially when the statute thus repealed was declaratory of the common law only in a partial sense. The act of 1792 relative to champerty is a penal statute. It defines a criminal offense and prescribes the punishment for it. In the sense that the offense it defines was champerty at common law and an offense at common law, the statute is declaratory of the common law; but it is not declaratory of the common law in the sense that it is a statutory expression of all the common law on the subject, for it modifies the common law and deals with only a branch of the subject. The statute is restrictive in its definition, narrowing the common law, for the sale of pretended titles, the buying of choses in action, and many other forms of interference not included in the statute were champertous at common law, though they may not have amounted to a criminal offense. The statute was strictly a penal one, defining a criminal offense, and fixing its punishment. Even if it be true that,

by reason of the implied repeal of this statute, champerty is no longer a criminal offense in Virginia, which may fairly be regarded as doubtful, it would be an unwarranted extension of the doctrine of implied repeal to allow to the implied repeal of a criminal statute the effect of abrogating an important doctrine of the law of contracts as it existed at common law, exists now in nearly all the states of the Union, and has been supposed and held to exist in Virginia by the courts, the general assembly and the bar of the state.

"In the case of *Nickles* v. *Kane,* 82 Va. 312, the Supreme Court of Appeals of this state has distinctly declared that, whether the statute of 1792 be regarded as declaratory of the common law or as repealing the common law, the common law as to champerty with respect to the validity of contracts, is the law of Virginia to-day; and this I conceive to be both a true and a binding declaration of the law.

"The other proposition urged on the rehearing was that the contract in question is a Pennsylvania contract, to be governed as to its validity by the law of that state, and that the law of another state is a fact to be proven like other facts, and cannot be known to the court on a demurrer.

"I cannot agree that the contract is to be governed by the law of Pennsylvania. The champertous suits were to be brought in Virginia, and the law of this state governs the validity of the contract. Minor on Conf. Laws, p. 404.

"The case of *Blackwell* v. *Webster,* 29 Fed. Rep. 614, cited by counsel for complainant, on examination is found to have turned on the particular form of the Maine statute, and is easily distinguishable without conflict with the rule as stated by Mr. Minor. Indeed, Mr. Minor refers to the case and approves it. The contract in question in the case at bar is, moreover, a contract relating to real estate, and it is well settled that such contracts are governed by the *lex loci rei sitae.* 3 Minor's Insts., 144.

"With respect to the amendments tendered by complainant, the court is of opinion to reject them. The bill has been amended twice already, and after these amendments, and after a thorough argument of the case on its merits, the court announced its decision. A due regard to the orderly procedure of the court and the rights of the opposing party require that some limit be set to the privilege of amendment. The amendments now presented are offered without explanation or excuse, and in the main are unsubstantial, and would not change the opinion of the court on the merits of the case.

"Paragraph No. 1 sets out that before the original contract between complainant and Miss Hollingsworth was made, it was understood and agreed that a compromise could be and was to be affected with the adverse claimants of 13,800 acres of the land in dispute, and that these adverse claimants had been advised by their counsel that their title was worthless, and that the agent of Miss Hollingsworth was so advised by complainant; and, further, that such a compromise would have furnished sufficient property belonging to Miss Hollingsworth to provide for the payment of costs. This was prior to the contract between General Roller and Miss Hollingsworth, and not a part of that contract. Whatever may have been the expectation as to the ease with which these adverse claimants might be induced to abandon their claims, they had not in fact been settled at the time the complainant's contract of employment was entered into, and that contract dealt with all the 52,000 acres in dispute, and looked to its recovery, and stipulated for the payment of costs by the counsel. The bill and the first amended bill allege that the complainant, acting under and in pursuance of his contract aforesaid, and for the compensation then stipulated, proceeded to and did, by actions and otherwise, recover the whole of the 52,000 acres of land which was the subject of the contract, and this, indeed, is the basis of the present suit.

"Paragraph 4 of the amendments alleges that Miss Hollings-

worth conveyed to Mrs. Murray upon the consideration and condition that the grantee should pay to General Roller one-fifth of the proceeds to be realized on a sale of the property. I take this to be but a variation of the phraseology of the former pleadings, the facts being set out in the former bills, while in this amendment they are pleaded according to their legal effect as conceived by counsel. This view is fully verified by the brief filed by complainant himself, and by his oral argument, and by the brief of his counsel also; in all of which it was insisted that Mrs. Murray, in consideration of the conveyance to her, undertook to carry out the contract of Miss Hollingsworth with General Roller, and that the only contract that she had knowledge of was the contract of 1875, and that the contract of 1875 was, therefore, the one as to which she undertook to stand in Miss Hollingsworth's place and to carry out. The views of the court on this question are fully set out in its former opinion, and it sees no reason to change them. The other amendments offered are mere amplifications of the former pleadings and would not affect the result.

"The conveyance at one time by Miss Hollingsworth to General Roller of a one-fifth interest in a certain portion of the lands lying in West Virginia, the deed for which was afterwards returned to her, is urged as a reason why the court should retain jurisdiction and grant relief as to that portion of the land; but this is a suit to enforce the sale of the land under the Wheelock deed of trust, and this court cannot decree the sale of land lying in West Virginia, even if such relief would be proper under the other facts of the case.

"The case of *Brown* v. *Bigne,* 21 Ore. 260, 28 Pac. 11, 28 Am. St. Rep. 752, 14 L. R. A. 745, quoted in *Johnson* v. *Van Wyck, supra,* has been much relied on by counsel for complainant in the argument of what constitutes a champertous contract, but I do not think it sustains their position. In that case Bigne was engaged in a necessary and meritorious suit, al-

ready begun, and found himself, pending the suit, without means to prosecute it further, and thereafter he entered into a contract with Brown by which the latter furnished the funds to carry on the suit already begun to a termination for a share of the proceeds. The court upheld the contract under the cir-. cumstances of the case, but said: 'When such contracts are made for the purpose of * * * inducing suits to be begun which otherwise would not be commenced * * * they come within the principles and analogy of that doctrine, and should not be enforced.' 41 L. R. A. 526.

"A decree can be drawn denying leave to file the amendments offered, sustaining the demurrer of Mrs. Murray, and also that filed by the Pocahontas Co. and the Chesapeake Western Co., which was filed after the former opinion of the court was announced (sustaining the latter demurrer *pro forma*), and dismissing the bills; and also dissolving the injunction formerly awarded."

For the reasons given by the circuit court, we are of opinion that its decree should be affirmed.

*Affirmed.*