## Richmond

### James Ventro, Et Al. v. Clinchfield Coal Corporation.

April 28, 1958.

Record No. 4772.

Present, All the Justices.

The opinion states the case.

*David E. Wells* and *G. Mark French* (*R. C. Shannon; D. F. Kennedy*, on brief), for the appellants.

*Fred B. Greear* (*Greear, Bowen, Mullins & Winston*, on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

In this suit instituted by Clinchfield Coal Corporation against James Ventro, Lee Dotson, Carlyle Browning, Verlin Browning, and Gerald Browning, defendants, it asserted ownership to all coal, other minerals, oil and mining rights in a tract of land on Bold Camp Creek in Wise county, Virginia, containing 175 acres. The object of the suit was to quiet and remove clouds from Clinchfield's title to the coal, other minerals and oil occasioned by James Ventro's claims under deeds and through alleged adverse possession, enjoin Ventro and his lessees from mining coal, and have an accounting for all coal removed from the premises.

Ventro and three other defendants appeared, answered the bill, and claimed rights in the 175 acre tract. They asserted that Clinchfield did not own the coal, oil and minerals, nor was it in possession, that Ventro owned the surface rights and was also in possession of and had acquired the coal, oil and minerals by conveyance and through adverse possession, and that the other defendants were mining the coal under a lease from Ventro. Defendants also charged that a deed from Andrew J. Mullins to Riley Mullins through which Clinchfield traces ownership to the coal, oil and minerals was forged, and that the consideration for a recent deed from Riley Mullins to Clinchfield was champertous, and for those reasons it could not maintain this action.

Though Clinchfield and the defendants made claim in the pleadings to the coal, minerals, oil and mining rights in 175 acres, the evidence discloses that the acreage actually involved is from 105½ to 108 acres.

The cause was heard upon depositions, and the relief prayed for by Clinchfield was granted. From a decree that established Clinchfield's right to the coal, minerals and "mining rights and privileges" in the 105½ acres, more or less, quieted its title thereto, permanently enjoined James Ventro and the other defendants from removing any coal or minerals, and referred the cause to a commissioner for an accounting and assessment of damages, Ventro and other defendants appealed.

The cause having been determined upon evidence taken by depositions, the decree of the chancellor is presumed to be correct and may not be reversed for lack of proof if it be supported by a fair preponderance of the evidence. *Klingstein* v. *Eagle*, 193 Va. 350, 68 S. E. 2d 547, *Everton* v. *Askew*, 199 Va. 778, 102 S.E. 2d 156.

Defendants' assignments of error assert that the court erred when it held that

(1) the coal and minerals were reserved by Andrew J. Mullins in a deed from him to W. H. Dorton of April 28, 1894, and did not pass to Dorton through whom Ventro claims color of title;

(2) a deed from Andrew J. Mullins to Riley Mullins through which Clinchfield claims was genuine and not a forgery;

(3) Ventro had not acquired the coal and minerals by adverse possession; and

(4) an agreement between Riley Mullins and Clinchfield was not champertous.

Numerous deeds and other written instruments were filed in evidence and the testimony of the many witnesses is voluminous. It would be confusing and serve no good purpose to refer to the many exhibits or recite the testimony in detail. The pertinent and controlling documentary evidence and testimony may be summarized and stated as follows:

It is conceded that prior to 1887 George A. Warder was the owner of a large tract of land that included the 175 acres described in the bill, of which the 105½ (108) acre tract under which the coal, oil and minerals are in controversy is a part.

Below is the evidence upon which Clinchfield relies to sustain its record title.

Clinchfield presented a deed from Wilson Mullins and wife to Jesse Beam dated June 3, 1887, conveying "all the coal and other minerals and oil" on the tract of 175 acres. This deed recites that legal title to the tract was vested in J. H. Snodgrass, "the purchase

money having been all paid & said Wilson Mullins hereby binds himself to secure from said Snodgrass a good & sufficient deed to said land & when so obtained it shall" inure to Beam. Numerous other deeds show that this title and interest, such as it was, to the coal, minerals and oil acquired by Beam from Wilson Mullins came to Clinchfield by mesne conveyances set out in the bill and proved in evidence.

It does not appear that Wilson Mullins had obtained a deed to the coal, oil and mineral rights under this land at the time that he made conveyance to Beam, for the title is said to be in Snodgrass. Yet tending to show that Wilson Mullins owned an equitable interest in the tract of land and somewhat confirmatory of his right to convey the coal, minerals and oil is a deed introduced by Clinchfield from George A. Warder by Thomas W. Davis, attorney in fact, to Andrew J. Mullins, dated August 19, 1892, conveying 260 acres in fee, of which the 175 acres are a part. This deed contains the recital that it is made

"* * * in pursuance to a title bond heretofore executed to Wilson Mullins by Wm. B. Aston a former agent, and being *and being* part of the land sold by H. A. Routh Comr., to enforce the collection of the purchase money, said land was also under a deed of trust executed to White & Buchanan, but all the purchase money having been fully paid to said Warders, also to White & Buchanan, but no deed having been made from Warders, doth bargain, sell, grant and convey with covenants of general warranty deed to the said Andrew J. Mullins he having bought the said land from the said Wilson Mullins * * *."

This deed has the effect of conveying to Andrew J. Mullins the 260 acres, subject to Wilson Mullins' prior conveyance to Beam of such title as he had to the coal, minerals and oil under the 175 acres, which estate, as stated, was thereafter acquired by Clinchfield.

By deed of August 8, 1935, not recorded until July 7, 1953, Andrew J. Mullins, widower, conveyed to his son, Riley Mullins "all the coal, oil, gas, salt, and all other minerals" on the 260 acre tract, excepting, however, all the coal under 62½ acres "heretofore sold and conveyed by the said Andrew J. Mullins" and wife to C. T. Flanary, Patrick Hagen, and E. M. Davis by deed dated June 4, 1887. If valid, its effect was to vest in Riley Mullins all coal, oil, gas and other minerals in the 260 acres that Andrew J. Mullins owned, less the coal under the 62½ acres sold to Flanary, Hagen and Davis.

This is the deed that Ventro claims was forged by Riley J. Mullins.

Clinchfield asserted its claim to the coal, oil and other minerals under the 175 acres through its chain of title originating with the deed dated June 3, 1887, from Wilson Mullins and wife to Jesse Beam. Riley Mullins asserted ownership to the coal, oil and all other minerals under the 260 acres through his deed of August 8, 1935, from Andrew J. Mullins, grantee of Warder in the deed of August 19, 1892. With these two antagonistic but *bona fide* claims asserted, Clinchfield arranged to acquire Riley Mullins' interest in the coal, oil and other minerals. By deed from Riley Mullins and wife to Clinchfield of September 25, 1953, Mullins conveyed the coal, oil, gas and other minerals in the 260 acre tract, but he excepted that theretofore conveyed by Andrew J. Mullins to C. F. Flanary and others in 62½ acres. This deed had the effect of consolidating in Clinchfield the title and interest of Riley Mullins and of Clinchfield in the coal, oil, minerals and mining rights in the 260 acres, less the coal and minerals in the 62½ acres conveyed to Flanary and others.

Ventro asserts that the consideration for this deed was champertous and prevents Clinchfield from maintaining this suit.

The record evidence relied upon by defendants to defeat Clinchfield's title and to establish color of title in Ventro follows:

Ventro's title originates with the deed of August 19, 1892, from George A. Warder by Thomas W. Davis, attorney in fact, to Andrew J. Mullins conveying 260 acres. The next link in the chain through which Ventro claims is a deed of April 28, 1894, from Andrew J. Mullins and wife to W. H. Dorton conveying 108 acres, more or less, of the 260 acre tract. However, in the latter deed the description of the tract conveyed concludes with this language:

"* * * said party of the first part does not by this conveyance convey the coal in under and upon said land having been heretofore conveyed to C. F. Flanary and part to Dotson and the Coal and Mineral on the Dotson part by Wilson Mullins and wife and all the poplar timber bran*ed* with H, the parties of the second part to have and hold forever except the coal and mineral as above mentioned and as mentioned in said deed from said Mullins and wife to W. H. Dorton."

Clinchfield claims that this provision excepts and reserves from the conveyance to W. H. Dorton, the coal and minerals and expressly recognizes that the coal and minerals had been previously conveyed by Wilson Mullins and wife. Clinchfield says that it is also significant that another deed from Andrew J. Mullins and wife

to Henry Brummitt, dated April 28, 1894, conveying 123 acres of the 260 acre tract, contains the same exception or reservation of the coal and minerals as does the deed to W. H. Dorton.

In subsequent conveyances in Ventro's chain of title, the 105½ acres were divided into two tracts of 75½ acres and 30 acres respectively, but in each instance a fee simple title was ostensibly granted (in the respective tracts) except in two deeds hereinafter mentioned. Through mesne conveyances, the two tracts came into the ownership of Guy Ventro, but in the conveyance of the 30 acre tract to him by A. M. Vicars, special commissioner, and W. B. Adington on October 15, 1917, this paragraph appears:

"EXCEPTING THEREOUT AND THEREFROM all the coal and minerals in, upon and under the tract or parcel of land hereinbefore described, together with such mining rights and privileges as may have been heretofore sold and conveyed."

Guy Ventro lived on the 105½ acres until his death on February 23, 1953, intestate and without issue. By deed of March 10, 1953, James Ventro, decedent's nephew, acquired the 105½ acres by conveyance from all of Guy Ventro's heirs, except one sister in Italy. That deed contains the following provision:

"[T]hat this conveyance is made subject to all of the former exceptions and reservations and adverse conveyances which was heretofore reserved, excepted or conveyed * * *."

James Ventro lives on the 105½ acres and asserts that Clinchfield has not proved a record title to the coal and minerals and that he owns the coal and minerals by adverse possession under color of title established by his uncle Guy Ventro.

The evidence bearing upon Ventro's claim that the deed from Andrew J. Mullins to Riley Mullins was forged and that his predecessor in title, Guy Ventro, acquired the coal and minerals under the 105½ acre tract by adverse possession follows:

At the time the depositions were taken, Andrew J. Mullins, who never learned to write and signed all instruments with a crossmark, was living, but he was about ninety-eight years of age and unable to testify. Seventeen witnesses were offered by Ventro to prove that the cross mark signature on the deed from Andrew J. Mullins to Riley Mullins was a forgery and that Andrew J. Mullins, grantor, had instead executed, about 1936, a deed conveying the coal to Riley Mullins and Rufus Mullins, which deed had, however, been allegedly lost. The original deed from Andrew J. Mullins, widower, to Riley

Mullins, bearing grantor's name and an "X" cross mark, and purportedly acknowledged before S. B. Stallard, justice of the peace, whose name is signed to it, is in evidence. Several of grantor's sons, the eldest of whom was 79 years old, testified to circumstances bearing upon execution of the challenged instrument. Much of this testimony is contradictory and that having to do with whether or not the acknowledgment taken by Stallard, who died years ago, was genuine is unsatisfactory and inconclusive. Some witnesses merely said that they had heard Andrew J. Mullins say that he had executed a deed to Riley and Rufus Mullins or heard Riley Mullins say that he and Rufus owned the coal together and some witnesses undertook to give an opinion that the signature of S. B. Stallard to the certificate of acknowledgment did not look genuine. None of these witnesses was particularly familiar with Stallard's handwriting. Two affidavits prepared in 1953 and signed with an "X" mark by Andrew J. Mullins were also introduced, the tenor of which was that years ago he had executed a deed to Riley and Rufus Mullins for the coal and minerals, but no deed to Riley Mullins alone. These affidavits were prepared at the instance of persons whose interests were antagonistic to Clinchfield and Riley Mullins. The affidavits are to some extent contradictory, the theory upon which they were admissible is not stated, and one was withdrawn by agreement of counsel. Other witnesses stated that during recent years they had heard Andrew J. Mullins say that he conveyed the coal to Riley and Rufus.

It was Riley Mullins who produced the original deed in question. He testified that he paid the $500 consideration mentioned therein for the coal and minerals, that it was executed by Andrew J. Mullins and acknowledged before and signed by S. B. Stallard, that he had placed it in his trunk and kept it there until the date of its recordation. He also produced in evidence the earlier deed from Warder to Andrew J. Mullins and said that it was given to him by his father to be used when the deed in question was drawn, that he had presented the Warder deed to C. A. Vance, who prepared deeds, and he drafted the deed in question shortly before it was signed and acknowledged by his father. He and other witnesses also explained that the allegedly lost deed in which he and Rufus were the grantees was to convey the home tract of land which was in their mother's name, but she died before its execution. Other witnesses, including two of Stallard's daughters, testified that Stallard's signature to the certificate of acknowledgment was in Stallard's handwriting, and two

witnesses who knew Stallard said that he enjoyed an excellent reputation for probity and honesty.

Ventro offered 22 witnesses to establish ownership of the coal and minerals by adverse possession. Their testimony shows that Guy Ventro, when he died in February, 1953, had occupied the tract of land and lived upon the property since 1916 or 1917 when he obtained deeds that conveyed to him 75½ acres and 30 acres respectively. It also shows that he mined coal for his domestic use and at times sold some to neighbors, which was mined by hand and transported by wheelbarrow to where it would be used in the vicinity. On a few occasions small quantities were sold for use at schools, but no machinery was ever used in the mining, and no commercial activity of moment was carried on at any time. Some witnesses also testified that they had heard Guy Ventro state that he owned the coal and most of the people in the community thought that he was the owner, but one of Ventro's witnesses said that he had heard that Clinchfield owned the coal on the tract of land. At most the testimony only tended to show that Ventro made oral claim to the coal, that it was sporadically mined, and small quantities sold at different times over the years.

Taxes on the surface of the 105½ acres have been assessed for many years in the name of Guy Ventro and paid by Guy or James Ventro, but for years taxes on the coal and minerals under the 175 acres have been assessed against and paid by Clinchfield.

Clinchfield's two land agents testified that they observed that Guy Ventro had, in years past, taken out some coal for domestic use, but when they inspected the premises there were no conditions at any of the small mine openings to indicate any commercial mining. When they learned that James Ventro had entered into a lease to mine and remove coal, they protested, and this suit was thereafter instituted. One of the agents also said it was the policy of Clinchfield to allow persons owning the surface and living thereon to mine coal for domestic uses, and unless they undertook to do commercial mining of the coal, the company raised no objection.

When it became known that coal was being mined commercially by defendants, Clinchfield and Mullins entered into a written agreement whereby the latter agreed to convey his interest in the coal and minerals in the 260 acre tract to Clinchfield, and the corporation agreed to undertake this litigation against defendants. The agreement recited that Riley Mullins and Clinchfield respectively claimed

ownership of the coal, minerals and mining rights in the 260 acre tract and the 175 acre tract. It provided that in event of successful termination of the litigation against defendants, Clinchfield would convey to Mullins and his attorneys an undivided one-half interest in the mineral rights in 175 acres and pay Mullins one-half of any damages recovered and one-half of a reasonable fee to counsel conducting the litigation. The effect of the agreement was that Clinchfield and Riley Mullins, each of whom claimed the coal, oil and minerals, joined hands against Ventro and agreed that they would divide whatever was recovered, *i.e.*, land, mineral rights, and damages. Pursuant to this agreement Riley Mullins conveyed his interest in the coal, oil, gas and mineral rights in the 260 acres to Clinchfield.

The pertinent evidence, documentary and oral, having been stated, we now address ourselves to the four legal questions presented by the assignments of error, the first of which is whether or not the coal and minerals were reserved by Andrew J. Mullins in his deed of April 28, 1894, to W. H. Dorton, and thus did not pass to Ventro who claims through Dorton.

"It is true that the ownership of coal or other underlying mineral may be separated from the surface by a deed of record, and that thereafter there will be two estates in the same land (*Va. Coal and Iron Co.* v. *Kelly*, 93 Va. 332), and where such separation has taken place the owner of the surface of the land and the owner of the minerals under it are neither joint tenants nor tenants in common. 'They are not the owners of undivided interests in the same subject, but are the owners of distinct subjects of entirely different natures. The title to the freehold of the one, either in the surface or the minerals, cannot be acquired by adverse possession of the other, and the purchase of the outstanding title by the one does not enure to the benefit of the other.' " *Interstate Coal & Iron Co.* v. *Clintwood Coal & Timber Co., et al.*, 105 Va. 574, 591, 54 S. E. 593. 1 Am. Jur., Adverse Possession, § 114, p. 856.

The technical distinction of whether or not the provision in the deed of 1894 from Andrew J. Mullins to W. H. Dorton constitutes an exception or a reservation of the coal and minerals need not be determined. *Bradley* v. *Virginia Railway & Power Co.*, 118 Va. 233, 87 S. E. 721; *Bostic* v. *Bostic*, 199 Va. 348, 99 S. E. 2d 591; 1 Minor, *Real Property*, Ribble ed., § 96, p. 129. Whichever it be, the language "* * * the said party of the first part does not by this conveyance convey the coal in and under and upon said land * * *

the parties of the second part to have and hold former except the coal and minerals as before mentioned * * *," is sufficient to show that the grantor did not intend to vest the coal and minerals or estate in the grantee. It is plain that this deed did not convey the coal and minerals in and under the tract of land, and the trial court's holding on that issue was correct.

■ Was the deed to Riley Mullins from Andrew J. Mullins, signed by his "X" mark and purportedly acknowledged before S. B. Stallard a forgery?

Forgery being a crime and a flagrant species of fraud, the burden was upon defendants to prove that charge by clear and cogent evidence. 8 M. J., Fraud and Deceit, §§ 55, 56; 24 Am. Jur., Fraud and Deceit, §§ 255, 256.

The evidence tending to show that the deed was forged and the acknowledgment spurious is no more trustworthy or convincing than that offered to prove that it was a genuine instrument. It follows that the trial court's holding on this issue was correct.

■ Did James Ventro, who is concededly the record owner of the surface to the 105½ acres (less the interest of a sister of Guy Ventro) and who claims through Guy Ventro, prove ownership to the coal and other minerals by adverse possession?

Deeds introduced in evidence prove that there had been a severance of the title and ownership of the coal, other minerals and oil from the title and ownership of the surface. This severance was made years before Guy Ventro acquired the surface and existed when he first occupied and lived upon the 105½ acres.

"Although after a severance of the mineral and surface estates, the surface owner cannot acquire title to the minerals merely by virtue of his possession of the surface, title to the minerals may nevertheless be acquired by adverse possession, not only by the owner of the surface, but by a person having no interest in the surface, providing, of course, that there has been an actual, open, notorious, and hostile possession thereof for the statutory limitation period, as distinguished from the possession of the surface, but not otherwise." 1 Am. Jur., Adverse Possession, § 120, p. 859.

Though full weight be given to the evidence relied upon by Ventro, it does not prove that there was actual, open, notorious, and hostile possession of the coal by Guy Ventro. The nature of his sporadic and limited mining operations was in keeping with the recognized relations existing between surface owners and owners of the

coal and mineral rights. His mining operations were not antagonistic to the interests of Clinchfield or Riley Mullins but were tacitly permitted, and thus not adverse to their ownership of the coal and other minerals.

Was the agreement of September 23, 1953, between Clinchfield and Riley Mullins champertous?

"Champerty may be defined to be a bargain with the plaintiff or defendant in a suit for a portion of the land or other matter sued for in case of a successful termination of the suit, *which the champertor undertakes to carry on* at his own expense; and champetry avoids the contracts into which it enters." *Nickels* v. *Kane's Adm'r.*, 82 Va. 309, 312. *Roller* v. *Murray, et al.*, 107 Va. 527, 59 S. E. 421; *Seward* v. *Camp Manufacturing Co.*, 112 Va. 479, 71 S. E. 614; 3 M. J., Champerty and Maintenance, § 2, p. 867; 10 Am. Jur., Champerty and Maintenance, § 2, p. 550; 14 C. J. S., Champerty and Maintenance, § 1, p. 356.

The factors relied upon to relieve this agreement from the stigma and effect of champerty are that Clinchfield and Mullins had *bona fide* claims to the subject matter to be litigated.

The evidence clearly shows that Mullins and Clinchfield were justified in asserting ownership of the coal, oil and mining rights in question. Where such state of facts exists, contracts concerning litigation that might otherwise be champertous are not afflicted with that infirmity.

"A general exception to the rule that maintenance or champerty may be involved in contracts concerning litigation is made where the parties thereto both have an interest in the subject of the litigation or in the litigation itself." 10 Am. Jur., Champerty and Maintenance, § 4, p. 551. 3 M. J., Champerty and Maintenance, § 3, p. 869; 14 C. J. S., Champerty and Maintenance, § 26, p. 368; Williston, *Contracts*, § 1714, p. 4845. The charge of champerty is not sustained.

We find that the evidence proves title and ownership of the "coal and minerals and mining rights and privileges" in the 105½ to 108 acres to be vested in Clinchfield as decreed by the trial court.

*Affirmed.*